IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 14-cv-01610-LTB

MICHELLE CHANCELLOR PHEGLEY,

     Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

     Defendant.

_____

ORDER
_____

Plaintiff Michelle Chancellor Phegley appeals Defendant's (the "Commissioner") final administrative decision denying her claim for disability insurance benefits under Titles II and XVI of the Social Security Act (the "Act"). Jurisdiction in this appeal is proper pursuant to 42 U.S.C. § 405(g). Oral argument would not materially assist in the determination of this appeal. After consideration of the briefs and the record, I affirm the Commissioner's decision in part; reverse it in part; and remand the case for further proceedings consistent with this Order.

**I.  Statement of the Case**

A video hearing on Plaintiff's claim was held before an administrative law judge (the "ALJ") on November 14, 2012. On December 13, 2012, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. The Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's December 13, 2012 decision the Commissioner's final decision for purposes of my review. Plaintiff timely filed this appeal seeking review of the Commissioner's final decision.

## II. Statement of Facts

### A. Background

Plaintiff was born on March 24, 1963, making her 47 years old at the time of her alleged disability onset date of May 13, 2010. Administrative Record ("AR") 22 & 32. Plaintiff has a high school education and has worked in the past as a certified nursing assistant, retail sales clerk, vending machine coin collector, retail sales manager, caterer helper, and manager of fast food services. AR 66 & 201. Plaintiff initially alleged disability due to septic arthritis, "antylosing", spine sponlytitis, migraines, nerve palsy, degenerative disk disease, issues with her cervical spine, carpal tunnel, bunions on her feet, and clavicular dysfunction. AR 200.

### B. Relevant Medical Evidence

#### 1. Evidence Relating to Plaintiff's Mental Health

In January of 2011, Plaintiff began treatment with Colorado West Mental Health following her release from jail for possession of methamphetamine. AR 562. Plaintiff was diagnosed with methamphetamine dependence and assigned a GAF score of 50. AR 569. Plaintiff's mental status examination revealed that she had normal language; intact judgment/insight; normal memory; logical and goal directed thought process/content; and an affect/mood that was appropriate to content. AR 566. Plaintiff was assessed as a moderate risk for suicide though she had no suicidal thoughts at that time and admitted to a 90-day residential treatment program. AR 566 &569.

In March of 2011, Plaintiff began treatment at the Marillac Clinic for both physical and mental health issues. AR 582-89. Kyla Hauser, LCSW, reported that Plaintiff was seeking mental health treatment to address trauma resulting from rape and childhood abuse and observed that Plaintiff had a great deal of anxiety but was alert and focused with a logical and coherent

thought process. AR 588. Ms. Hauser diagnosed Plaintiff with Post-Traumatic Stress Disorder ("PTSD"). *Id.*

On May 14, 2011, Kelly Common, D.O., performed a consultative examination of Plaintiff at the Commissioner's request. Dr. Common recommended a psychological evaluation for Plaintiff's PTSD and noted that Plaintiff seemed slightly agoraphobic. AR 599.

The recommended psychological consultative evaluation of Plaintiff was performed by Michael T. Andres, Ph.D., on June 13, 2011. Dr. Andres noted that Plaintiff reported suffering from severe PTSD, dissociation, and hypervigilance. AR 607. Plaintiff attributed her problems to a rape in 2007; an attack by a wolf while hiking in 1992; a car accident in 2009; and a fall in 2010 and claimed that she was unable to work due to PTSD, migraines, pain, flashbacks, night terrors, and black outs. *Id.*

Upon examination, Dr. Andres observed that Plaintiff was very cooperative and pleasant with good energy and eye contact; relaxed after being a bit anxious initially; appropriate in her behavior, affect, and facial expressions; and clear in her speech and thought process. AR 609-10. Dr. Andres thought Plaintiff was cooperative but "may have tried to exaggerate some of her symptoms." AR 610. Plaintiff had no symptoms of mania, and was negative for hallucinations, delusions, homicidal ideation, dissociation, and current suicidal thoughts. *Id.* Based on questions he asked during the examination, Dr. Andres concluded that Plaintiff's immediate memory and abstract thinking skills were good; her concentration was fair; her delayed memory and fund of general information were poor; and her judgment and reasoning skills were very poor. *Id.*

Dr. Andres diagnosed Plaintiff with chronic adjustment disorder with depression and anxiety; PTSD and alcohol and drug abuse in remission "per [Plaintiff's] report;" and personality disorder traits, not otherwise specified. AR 611. Dr. Andres assigned Plaintiff a GAF score of 70 and opined that Plaintiff might benefit from one-on-one counseling, group support, life management skills, and a vocational training program. AR 611-12.

Plaintiff's vocational rehabilitation counselor referred her to Evelyn Anglim, Ed.S. for a psychotherapy assessment. In a report dated December 9, 2011, Ms. Anglim observed Plaintiff to be oriented in all three spheres and appropriate throughout their two appointments. AR 742. Ms. Anglim diagnosed Plaintiff with bipolar II disorder (rule out); PTSD; dissociative identity disorder (rule out); amphetamine abuse in full sustained remission; and alcohol abuse (rule out) and assigned her a GAF score of 35. AR 742. Ms. Anglim noted that Plaintiff had a significant history of sexual/physical; mental/emotional; and substance abuse and recommended that Plaintiff be assessed by a psychiatrist for medication options to treat her extreme anxiety. AR 744. Once Plaintff was stabilized on medication, Ms. Anglim opined that Plaintiff might benefit from psychotherapy with a clinician experienced in working with complicated diagnoses and severe dissociative symptoms. *Id.*

In June of 2012, Plaintiff returned to Colorado West Mental Health "seeking help for her symptoms." AR 758. Plaintiff reported a history of hearing voices, hallucinations, and symptoms related to trauma. *Id.* Previous attempts at intervention were noted with the qualification that "none of them ... lasted very long or long enough to help [Plaintiff] start to process her experiences." AR 759. Plaintiff was not taking any medications for her mental health. *Id.* Plaintiff was diagnosed with PTSD, a generalized anxiety disorder, and assigned a

GAF score of 48.  AR 766.   Outpatient care was recommended for Plaintiff, and she was given a referral for individual therapy.  AR 767.

In June and July of 2012, Plaintiff was again seen at the Marillac Clinic.  During an assessment in June, Plaintiff reported that she was hearing voices and seeing black spots; not sleeping well; and experiencing severe anxiety.  AR 852-53.  The care provider at that appointment described Plaintiff as agitated, angry, and irritable with rapid speech, intense eye contact, and a logical but sometimes incoherent thought process.  AR 853.  At a July appointment, Plaintiff was described as "extremely anxious" but with a logical and coherent thought process and reported experiencing visual hallucinations and hearing voices.  AR 856.

After being released from incarceration for eluding a police officer who pulled her over for speeding, Plaintiff returned to Colorado West Mental Health in August of 2012 and reported that she was experiencing high anxiety, sleeplessness, racing and perseverative thoughts, hearing voices at times, seeing shadows and black spots at times, hypervigilance, and periods where she was unable to remember how she got places or acquired new things.  AR 745.  Plaintiff did not meet the criteria for hospitalization and was instructed to begin outpatient therapy again and pursue psychiatric care.  *Id.*

In October of 2012, Plaintiff was seen at the Marillac Clinic and requested "intensive outpatient substance abuse counseling."  AR 860.  Shortly thereafter, Plaintiff sought treatment from Inner Journey Community Counseling for where she was diagnosed with alcohol dependence and PTSD and assigned a GAF score of 63.  AR 784.  At her next appointment at the Marillac clinic, Michelle Eccles, MA, opined that Plaintiff "struggles tremendously in regards to her PTSD" and "remains so hypervigilant during our visits that she is either unable or unwilling

5

to process her traumatic experiences." AR 862.

During a visit to Colorado Mesa University and Grand Valley Urgent Care in November of 2012, David Gordon, M.D. prescribed Valium and Prozac to Plaintiff for her anxiety and observed that Plaintiff had appropriate eye contact, mood, affect, judgment, and insight and normal thought content, attention span, and ability to concentrate. AR 886. Dr. Gordan declined to fill out Plaintiff's disability paperwork because his office did not do such exams "especially for conditions that have failed to improve due to [Plaintiff's] lack of seeking treatment." AR 885.

On December 4, 2012, approximately one year after her psychotherapy assessment of Plaintiff, Ms. Anglim filled out a Medical Source Statement (Mental) in which she indicated that Plaintiff had marked to extreme limitations in virtually all mental work-related abilities. AR 898-904. Ms. Anglim stated that her evaluation of Plaintiff was supported by her initial therapy assessment of Plaintiff a year prior and numerous phone contacts that she had with Plaintiff over the year that followed related to Plaintiff's efforts to obtain treatment. AR 904.

Since the ALJ's decision in December of 2012, Plaintiff has had two psychiatric inpatient hospitalizations and additional appointments with mental health care providers. *See* Doc # 9.

### 2. Evidence Relating to Plaintiff's Physical Health

In the report from Plaintiff's May 14, 2011 consultative examination, Dr. Common diagnosed Plaintiff with migraine headaches, nerve palsy, carpal tunnel syndrome that did not appear to be affecting Plaintiff's day to day abilities, and clavicular dysfunction leaving Plaintiff "unable to perform full range of motion with the right shoulder." AR 599. Dr. Common opined that Plaintiff had no limitations for standing, walking, or sitting and that her only restriction

would be only lifting less than 10 pounds with her right shoulder. *Id.*

Plaintiff was treated in the emergency room following an automobile accident in October of 2011. Testing at that time showed significant degenerative change of the cervical spine. AR 730. An MRI in July of 2012 showed no disc protrusion or spinal stenosis but degenerative disc and facet disease of the lower lumbar spine. AR 843.

In December of 2011, Mitchell Copeland, D.O., treated Plaintiff for right shoulder pain and stiffness and numbness/tingling in her arm. AR 738. Dr. Copeland concluded that Plaintiff "likely has permanent scapular winging from her long thoracic nerve palsy" and a degenerative sternoclavicular joint and was likely to have "chronic scapulothoracic discomfort." AR 740.

## C. Plaintiff's Disability Hearing

At the November 14, 2012 video hearing, Plaintiff's attorney stated that although Plaintiff had both physical and mental health issues, it was her mental health that was "more critical, and the more serious condition that is, really, the thing that's keeping her from working, at this point." AR 46.

In response to questioning by her attorney, Plaintiff testified at the hearing that she tried to work as a chef at two restaurants but was unable to continue because circumstances at the restaurants triggered her PTSD and rendered her unable to perform the basic tasks of the job. AR 46-9. Plaintiff testified that her PTSD could be triggered by noises or someone coming up behind her and startling her. AR 49-50. Plaintiff testified that she also experienced dissociative episodes up to 2-3 times a week which she described as going into a state where she would start hallucinating; sometimes take off and not know how she got where she ended up; sometimes not be able to remember what she had done for up to a couple of days at a time; and sometimes not

recognize people she knew. AR 50-52 & 55. David Koff, who lived with Plaintiff at the time of the hearing, testified that he observed Plaintiff in a dissociative state that he described as manic a couple of times a week and that she could be triggered by low stress incidents like paying a utility bill. AR 63 & 65.

Plaintiff further testified that she had been drug and alcohol free since 2010; thought about suicide; and experienced nightmares and night terrors daily. AR 52 & 55. Physically, Plaintiff testified that she suffered from scoliosis, injuries to her upper body and back, arthritis, migraine headaches, and a long thoracic nerve tear to her right shoulder that prevented her from raising her right arm to shoulder height or higher, and carpal tunnel. AR 59-60. Plaintiff testified that she could only stand for about 25 minutes, sit for about an hour, and lift about 10 pounds at a time. AR 61.

The ALJ asked the vocational expert ("VE") if Plaintiff could perform any of her prior work if she was able to do light work activity with no overhead lifting and additional limitations of a moderate concentration impairment limiting her to routine, repetitive, unskilled work and a moderate social impairment limiting her to jobs where public interaction was not a primary component. AR 66-67. The VE responded no. AR 67. The ALJ asked the VE if there were jobs existing in the national economy that such an individual could perform. *Id.* The VE responded that such an individual could perform "unskilled and light" assembly, hand packaging, and sorting positions. *Id.* The ALJ then asked the VE if Plaintiff would be able to perform the identified jobs if her concentration impairment was marked such that she would be off task for up to one-third of an eight-hour workday. *Id.* The VE responded that there would be no work such an individual could perform. *Id.*

On follow up questioning, Plaintiff's attorney asked the VE if it would affect her answer to the ALJ's first hypothetical if the individual could not use her dominant hand more than occasionally. AR 68. The VE responded that there would be no work available for such an individual. AR 68-69.

**D. The ALJ's Decision**

In his ruling, the ALJ applied the five-step sequential process outlined in 20 C.F.R. §§ 404.1520(a). At the first step of the sequential process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of May 13, 2010. AR 22. At the second step, the ALJ determined that Plaintiff had severe impairments of (1) PTSD; (2) degenerative changes in the cervical spine; (3) adjustment disorder with depressive and anxiety features; and (4) right shoulder impairment with a deformed clavicle resulting in long thoracic palsy. *Id.* At the third step, the ALJ determined that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 25.

The ALJ next determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) but could not perform work that required any amount of overhead lifting. AR 27. The ALJ further determined that Plaintiff had a moderate social impairment that precluded her from any work in which public interaction is a primary job component and a moderate concentration impairment that limited her to routine, unskilled work activities. *Id.* Based on the assessed RFC, the ALJ concluded that Plaintiff was unable to perform any past relevant work but could work at other jobs existing in significant numbers in the national economy such as assembly-type, hand packaging, and sorting positions. AR 33.

Thus, the ALJ concluded that Plaintiff had not been disabled within the meaning of the Act from May 13, 2010 through the date of his decision. *Id.*

### III. Standard of Review

In reviewing the Commissioner's decision, I must determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied. *Castellano v. Secretary of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1992); *Hamilton v. Secretary of Health & Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hamilton, supra,* 961 F.2d at 1498. I "may neither reweigh the evidence nor substitute [my] discretion for that of the Administrative Law Judge." *Kelley v. Chater,* 62 F.3d 335, 337 (10th Cir. 1995).

### IV. Analysis

On appeal, Plaintiff argues that the ALJ erred (1) by failing to reconcile discrepancies between the VE's testimony and the *Dictionary of Occupational Titles* ("DOT"); (2) by failing to call a medical expert to opine on whether Plaintiff's mental impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (3) in his evaluation of the medical opinion evidence; and (4) in his credibility findings.

**A. The VE's Testimony**

At the hearing, the VE testified that Plaintiff could work at "assembly type of positions, *DOT* of 729.687-010;" "hand packaging position[s], *DOT* 789.687-066;" and "sorting positions ... *DOT* 920.687-042." The Commissioner concedes that the VE misidentified the *DOT* numbers for both the hand packaging and sorter positions but argues that this error was harmless because

there were a significant number of assembly type positions existing in the national economy that Plaintiff was capable of working. I disagree.

First, the hand packaging position identified by the VE is, when viewed under the correct *DOT* number of 920.587-018, a medium work position and therefore outside the parameters of Plaintiff's RFC for limited light work. The *DOT* number that the VE gave for this position actually corresponds to the position of "garment folder" which is a light work position that requires constant, or 2/3 of more of the time, reaching. Under the *DOT*, "reaching" means extending the hands and arms in any direction, including overhead.

The ALJ included a limitation of no overhead lifting in Plaintiff's RFC and explained that he found it "reasonable to preclude the plaintiff from all overheard reaching activities" based on medical evidence in the record. AR 30. *See also id. ("...the* record as a whole better supports restricting the claimant to no (rather than occasional) overhead activities."). Given the glaring discrepancies in the VE's testimony as a whole, I am unwilling to assume that she properly considered this limitation with respect to any of the jobs she identified by name or *DOT* number. The ALJ's conclusion that Plaintiff was capable of working the job of hand packager and/or DOT number 789.667-066 is therefore not supported by substantial evidence in the record.

Next, it is impossible to determine the correct DOT number for the generic "sorter" position the VE testified Plaintiff was capable of performing. *See e.g.* DOT numbers 753.598-010 (sorter in the boot and show industry); 769.687-042 (sorter in the wood products industry); 789.687-146 (remnant sorter). The *DOT* number that the VE gave for this position actually corresponds to the position of "bottling-line attendant" which is a light work position that requires frequent, or 1/3 to 2/3 of the time, reaching. Again, it is unclear from the *DOT* or the

VE's testimony if Plaintiff could perform this position with a restriction of no overhead reaching/lifting, and the ALJ's conclusion that Plaintiff was capable of performing the job of sorter and/or DOT number 920.687-042 is likewise not supported by substantial evidence in the record.

Finally, the assembly type of positions that the VE correctly identified by its *DOT* number of 729.687-010 also requires frequent, or 1/3 to 2/3 of the time, reaching. Without further clarification from the VE, it is unclear whether Plaintiff could perform this position with a restriction of no overhead reaching/lifting, and the ALJ's conclusion that Plaintiff was capable of working assembly type positions position under *DOT* number 920.687-042 is also not supported by substantial evidence in the record. It follows then that the ALJ's overall conclusion that there are jobs existing in the national economy that Plaintiff is capable of performing is not supported by substantial evidence in the record, and the case must be remanded for further consideration of this issue.

## B. The ALJ's Conclusion that Plaintiff's Mental Impairments Did Not Meet or Equal a Listed Impairment

Plaintiff argues that the ALJ was required to get an updated expert medical opinion on the issue of whether Plaintiff's mental impairments met or medically equaled a listed impairment because the evidence in the record demonstrated that her condition had deteriorated significantly since the June 28, 2011 state agency assessment to the contrary. I disagree.

Under SSR 96-6p, an ALJ must obtain an updated medical opinion as to whether a claimant's impairments are equivalent in severity to any listing "when additional medical evidence is received that *in the opinion of the [ALJ]* ... may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any

impairment in the listing of impairments." 1996 WL 374180 at **3-4 (emphasis added).

The ALJ's conclusion that Plaintiff's mental impairments did not meet or equal Listings 12.04 or 12.06 was based on his analysis of the "paragraph B" criteria, which requires that Plaintiff exhibit two of the following: a marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. AR 25. Specifically, the ALJ concluded that Plaintiff had a mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration and therefore did not meet the "paragraph B" criteria. AR 25-6.

The medical evidence in the record regarding Plaintiff's mental impairments dated subsequent to the June 28, 2011 state agency assessment but before ALJ's December 13, 2012 decision fails to establish that the ALJ abused his discretion in failing to obtain an updated medical opinion as to whether these impairments met or medically equaled a listed impairment. In particular, these records are largely unremarkable with respect to the "paragraph B" criteria relied on in the ALJ's determination at Step 3 of the sequential process.

To the extent that Plaintiff is relying on records dated after the ALJ's decision, these new records may well be material to a new application for benefits but they fail to demonstrate error by the ALJ based on Plaintiff's condition at the time of the hearing. *See Sanchez v. Sec'y of Health & Human Servs.,* 812 F.2d 509, 512 (9th Cir. 1987) (new evidence indicating deterioration after the hearing would be probative to a new application but is not probative of claimant's condition at the time of the hearing).

### C. The ALJ's Evaluation of the Medical Opinion Evidence

#### 1. Opinions of the State Agency Single Decision Maker

The ALJ gave "some weight" to "the State agency medical consultant's physical assessment" in his analysis of how Plaintiff's physical impairments affected her ability to work. AR 29. The Commissioner concedes that this was in error because the "State agency medical consultant" was actually a non-physician single decision maker ("SDM") whose opinion was entitled to no weight. The Commissioner argues, however, that this error was harmless because the ALJ relied more heavily on the examination findings of Dr. Common and other unspecified objective findings of Plaintiffs treating sources. I disagree.

The ALJ assigned "little weight" to Dr. Common's opinion that Plaintiff should be restricted to lifting less than 10 pounds with her right shoulder and instead "concurred" with the SDM that Plaintiff is capable of lifting and carrying 20 pounds. Although the Commissioner asserts that the ALJ's finding that Plaintiff was capable of lifting and carrying 20 pounds is consistent with Dr. Common's objective medical findings, the specific findings cited by the ALJ do not address Plaintiff's shoulder impairment which was the basis for Dr. Common's 10 pound limitation. AR 30. On remand then, the ALJ must also reconsider whether his assessment of Plaintiff's lifting and carrying limitation is supported by substantial evidence in the record excluding the opinion of the SDM.

#### 2. Opinions of Dr. Common

Plaintiff argues that the ALJ erred in giving "little weight" to the opinion of Dr. Common that Plaintiff should be restricted to lifting less than 10 pounds with her right shoulder because he gave more weight to the opinions of the SDM and because her opinion was supported by the

14

medical records. In reconsidering whether his assessment of Plaintiff's lifting and carrying capabilities is supported by substantial evidence in the record excluding the opinion of the SDM on remand, the ALJ should also reconsider whether he gave proper weight to Dr. Common's opinion that Plaintiff is limited to lifting less than 10 pounds with her right shoulder.

### 3. Opinions of Ms. Anglim

The ALJ gave "little weight" to Ms. Anglim's Medical Source Statement (Mental) in which she opined that Plaintiff had marked to extreme limitations in virtually all mental work-related abilities because Ms. Anglim, as a licensed professional counselor, was not an acceptable medical source; Ms. Anglim's opinions were not supported by her treatment notes; and there were no details in the record regarding the numerous telephone conversations Ms. Anglim had with Plaintiff and relied upon in reaching these opinions. AR 30. Plaintiff claims that each of the ALJ's articulated reasons for discounting Ms. Anglim's opinions were invalid. I disagree that the ALJ erred in his analysis at the time of the hearing.

Although Ms. Anglim qualifies as an "other source" whose records *may* be used to show the severity of Plaintiff's impairments and ability to work, *see* 20 C.F.R. § 404.1513(d), it does not follow that the ALJ was required to attach a certain amount of weight to her opinions. The ALJ expressed legitimate concerns regarding the validity of Ms. Anglim's December 2011 opinions regarding Plaintiff's mental limitations at the time those opinions were rendered. In particular, Ms. Anglim had not seen Plaintiff in person for approximately one year and her contemporaneous notes from those in-person appointments do not reflect the severe limitations she assessed.

While the ALJ's analysis of Ms. Anglim's opinions about Plaintiff's limitations may have been correct at the time of his decision, Ms. Anglim performed another in-person psychotherapy assessment of Plaintiff shortly thereafter that may alter this analysis. Specifically, Ms. Anglim had two appointments with Plaintiff in December of 2012. AR 906-7. During the first of these appointments, Plaintiff "presented a very different and behavior from all of [Ms. Anglim's] previous contacts with her both in person and by phone." AR 906. During the second appointment, however, Plaintiff "presented the affect and behavior [Ms. Anglim] was previously familiar with," AR 907, and Ms. Anglim's notes and opinions based on this appointment are therefore relevant to Plaintiff's condition and limitations during the time period at issue. On remand then, the ALJ should also consider Ms. Anglim's report from December of 2012 (AR 906-7) to the extent relevant to the time period at issue.

### 4. Opinions of Dr. Gottlieb

Plaintiff argues that the ALJ erred in attaching "some weight" to the opinions of Anthony Gottlieb, M.D., a State agency psychologist, on the basis that Dr. Gottlieb did not review all of the medical records that were available to the ALJ. It is clear, however, that the ALJ considered the additional medical records that were available to him and assessed greater limitations to Plaintiff in social functioning and interaction than Dr. Gottlieb. AR 30. I therefore find no error in the ALJ's treatment of Dr. Gottlieb's opinion.

### 5. Plaintiff's GAF Scores

Between January of 2011 and the ALJ's decision in December of 2012, Plaintiff received eight GAF assessments ranging from 35 to 70. The ALJ attached "little weight" to these scores because they represented only a snapshot of Plaintiff's function at the time assessed and were

16

unsupported by a longitudinal treatment relationship. AR 31. Plaintiff concedes that the ALJ correctly characterized the "snapshot" nature of the GAS assessments but argues that they nonetheless establish a pattern of impairment. Because of their limitations as noted by the ALJ and his consideration of the "record as a whole," *id.*, I find no error the ALJ's analysis of Plaintiff's GAF assessments.

## D.  The ALJ's Credibility Findings

### 1.  Plaintiff's Credibility

The ALJ found that Plaintiff was not entirely credible because she was able to maintain good grooming and hygiene; had not sought the degree of medical treatment one would expect for someone who was totally disabled; and had not followed up to obtain medication that was appropriate given her history of substance abuse. AR 29.   Plaintiff argues that these findings are not supported by substantial evidence in the record. I disagree.

"Credibility determinations are peculiarly the province of the finder of fact and ... will not [be] upset ... when supported by substantial evidence." *Hackett v. Barnhart,* 395 F.3d 1168, 1173 (10th Cir. 2005) (citations omitted). Here, the record supports all of the factual findings that the ALJ made in connection with his credibility determination. *See e.g.* AR 610, 742 & 822 (observations regarding Plaintiff's appearance and hygiene); AR 742, 759 & 845 (observations regarding lapses/inconsistences in Plaintiff's treatment); and AR 744, 856 & 858 (observations regarding medication options for Plaintiff). I therefore find that the ALJ's findings regarding Plaintiff's credibility are supported by substantial evidence in the record.

## V. Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED that the Commissioner's decision is AFFIRMED IN PART and REVERSED IN PART. The case is remanded for further proceedings consistent with this Order.

Dated: July  23 , 2015 in Denver, Colorado.

BY THE COURT:

   s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE
